Clarence N. Benson v. Commissioner. Dorothy A. Benson v. Commissioner.
Benson v. Commissioner
Docket Nos. 18752, 18753.
United States Tax Court
1950 Tax Ct. Memo LEXIS 288; 9 T.C.M. (CCH) 67; T.C.M. (RIA) 50021; January 27, 1950
*288 Amount of purchases for 1942 determined. The evidence failing to show that total receipts were not understated in the returns or that the amount of total receipts determined by the Commissioner was arbitrary and excessive, the amount of total receipts of restaurant business for 1943 and 1944, respectively, determined by the Commissioner, is approved. Joseph May, Esq., for the petitioners. Sheldon V. Ekman, Esq., for the respondent. VAN FOSSAN Memorandum Opinion VAN FOSSAN, Judge: The Commissioner determined deficiencies in income tax as follows: Docket No.
Year
Amount
18752
1943
$15,320.07
1944
2,418.35
18753
1944
2,415.31
The questions involved are whether the Commissioner erred (1) by increasing business income for 1942 by $22,491.97 by reducing the amount of reported purchases in that amount, and (2) by increasing business income for 1943 and 1944 by the amounts of $26,744.99 and $14.934.63, respectively, by increasing reported sales in such amounts, the amount of sales in each year having been determined by the Commissioner by a 100 per cent and a 200 per cent mark-up of purchases of food and of purchases of beer and liquor, *289 respectively. [The Facts] The petitioners are husband and wife. Clarence N. Benson, hereinafter referred to as the petitioner, during 1942 and 1943 operated as sole proprietor a restaurant, called "The Dog Club", in Buffalo, New York. The Dog Club was opened in November, 1941. During the year 1944 the restaurant business was owned and operated by petitioner and his wife as a partnership. The petitioner's wife has been in the restaurant business for 12 years and was manager of The Dog Club. The returns for the years involved were filed with the collector for the 28th district of New York. The 1942 and 1943 returns were stated to have been made on the cash basis. After an examination of petitioner's income tax return for 1942 and an investigation of his books and records by a revenue agent, no changes were made by the Commissioner in any of the figures shown in petitioner's 1942 return, except that the amount of purchases of $59,088.30 reported in "Schedule H - Profit (or Loss) from Business or Profession" was reduced by the amount of $22,491.97, based upon the revenue agent's report that petitioner's records disclosed purchases only in the amount of $36,596.33, as follows: *290 By Check
By Cash
Total
Liquor and Beer
$17,868.95
$ 1,770.50
$19,639.45
Food
5,507.31
9,856.94
15,364.25
Misc. - Soft drinks, tobacco, etc.
217.13
1,375.50
1,592.63
Total
$23,593.39
$13,002.94
$36,596.33 This adjustment resulted in an increase in reported net profit derived from the restaurant business of $3,370.23 to $25,862.20 and an increase in net income from $3,285.23 to $25,777.20. Petitioner's financial records for 1942 consisted of several so-called daybooks, which contained entries of daily cash expenditures, business and personal, and also some entries in memo form of checks issued in 1942; cancelled checks; bills; invoices; cash reconciliation sheets on which were recorded total income for the day, amounts paid out, and a net figure to balance cash at the end of the day; and the worksheet of an accountant employed by petitioner to prepare his 1942 income tax return as the bookkeeper theretofore employed by petitioner fied in the latter part of December, 1942. The accounant's worksheet contained a detailed summary of checks issued and of cash expenditures shown in the daybooks in various classifications of expenses and merchandise *291 purchases. An examination of the financial records of petitioner by another accountant employed by him in 1946 disclosed that during 1942 checks were issued by petitioner for purchases of food, liquor, wine, beer, soft drinks, tobacco and other merchandise in the aggregate amount of $27,409.87 and that the daybooks disclosed additional purchases in cash during 1942 in the aggregate amount of $17,347.11, of which the amount of $11,241.76 was substantiated by bills or invoices, and the amount of $6,105.35 by penciled memo notations thereof on daily cash reconciliation sheets disclosing either the vendor's name or the type of merchandise purchased. These notations were made by petitioner's wife in the ordinary course of business at the time the purchases were made. [Opinion] It is argued by the respondent that the petitioner is not entitled to a deduction for purchases in excess of $40,412.81 consisting of the purchases paid for by check of $27,409.87 and the cash purchases of $13,002.94, originally allowed by him. In his brief he concedes the amount of $40,412.81 to be allowable as purchases. Although the petitioner concedes that his records for 1942 were improperly kept, *292 he contends that upon the evidence adduced the amount of $44,756.98, consisting of the purchases paid for by check and the cash purchases of $17,347.11 as recorded in the daybooks, is allowable. It is true that some of the cash purchases were not evidence by bills or invoices. However, those purchases were supported by notations thereof, showing either the vendor or the type of merchandise purchased, made in the daily cash reconciliation sheets in the ordinary course of business. The testimony of petitioner's wife that she often paid out money for purchases of food, liquor and other items and would "put it on my regular pay out slip that I had in the cash register every day" is undisputed. We find that the amount of purchases allowable is $44,756.98. It is also contended by petitioner that he is entitled to the deduction of $9,868.77, overhead expenses, and $3,616.50, amortization of leasehold improvements, which amounts had been erroneously included in the amount reported as purchases. The respondent argues that the amount of $9,868.77 is not deductible as overhead expense because the petitioner has failed to prove that such an amount was actually spent. The accountant employed *293 by petitioner in 1946 testified in substance that his examination of petitioner's records disclosed that the accountant who had prepared petitioner's return for 1942 had included in reported purchases the amount of $9,868.77, representing cash expenditures entered in the daybooks properly classifiable and deductible as overhead expenses; that there was a considerable amount of money expended in cash for overhead which would appear ordinary and necessary in the normal course of the business; that the accountant who had prepared the 1942 return had included in purchases all overhead items in the daybooks and that other items of overhead paid by check were separately designated as overhead and deducted as overhead expenses in the return. In the 1942 return, in computing the net profits derived from the restaurant business, deductions covering overhead expenses of $5,753.57 and $241.09, or a total of $5,994.66, were claimed and allowed by the Commissioner. Thus the petitioner now claims a deduction for overhead expenses in the total amount of $15,763.43 for 1942. In the 1943 return the deduction for overhead expenses, other than "Leasehold Expense", aggregated $11,776.57, and in the *294 1944 return $7,606.68. These deductions were allowed by the Commissioner. The burden of proof rested upon petitioner to show that he was entitled to the deduction of overhead expenses of $9,868.77 in addition to the amount of $5,994.66 claimed and allowed by the Commissioner. He has failed to discharge that burden. The testimony of the accountant that the amount of $9,868.77 represented allowable overhead items in addition to the amounts claimed is a conclusion unsupported by any evidence of facts upon which the conclusion was based. There is no evidence whatever as to the nature or character of the various items included in the amount. It is the duty of this Court to determine from the facts presented by the evidence whether or not the various items included in the amount claimed constituted allowable overhead expenses. This we are unable to do. It follows that the amount of $9,868.77 is not allowable as a deduction. As to the $3,616.50 item, the only evidence is the testimony of the accountant, who testified in substance that the accountant who prepared the 1942 return included this item in reported purchases, that he (the witness) considered this an error, but nevertheless an *295 item of admissible overhead on a tax return as it was one-fifth of leasehold improvements totalling some $18,000, which were spread over a five year period based on a lease, which lease he had been told was a five year lease, and that no allowance had been made for the item by the respondent in computing the deficiency for 1942. No deduction in the amount of $3,616.50 was claimed in the 1943 return or in the 1944 returns. In the 1943 return a deduction of $3,215.83 designated as "Leasehold Expense" was claimed. In each of the 1944 returns a deduction was claimed designated as "Leasehold Expense" in the amount of $1,607.92, or a total of $3,215.84. There is no explanation of these items in the returns. These deductions were allowed by the Commissioner. The restaurant was opened in November, 1941. Presumably the so-called improvements were made prior to such opening. The accountant's testimony apparently was based on his examination of the records for 1942. There is no evidence showing that he examined the records for 1941 or that the so-called improvements were improvements in fact. The lease is not in evidence. As to this item also, the petitioner has not met his burden of proof. *296 The claimed deduction, therefore, may not be allowed. The total of the allowable purchases of $44,756.98, the claimed overhead of $9,868.77 and the claimed leasehold improvements of $3,616.50 is $58,242.25. This leaves $846.05 of the reported purchases of $59,088.30 unaccounted for. The petitioner in his brief admits additional income beyond that shown in his return to the extent of $846.05. During the years 1943 and 1944 the records of the restaurant business were kept more efficiently. In the 1943 return, total receipts reported were $92,600.64. The inventories and merchandise purchased were reported as follows: Inventory at beginning of year at
cost
$ 2,140.00
Merchandise bought for sale
52,657.30
54,797.30
Less inventory at end of year at
cost
900.00
Total cost of merchandise sold
$53,897.30
Total receipts as reported were not accepted upon examination of the records of petitioner and the selling price for 1943 was determined by the revenue agent as follows: Cost
Selling
Item
Per Books
Mark-up
Price
Food
$22,775.63
100%
$ 44,551.26
Misc. (soft drinks, tobacco, etc.)
7,425.32
(cost)
7,425.32
Beer and Liquor: Invt. Jan. 1, 1943
$ 2,140.00
Purchases
21,216.35
Total
23,356.35
Less Invt. Dec. 31, 1943
900.00
Cost of beer and liquor sold
22,456.35
200%
67,369.05
$52,657.30
Total sales
119,345.63
Sales per return
92,600.64
Increase in income
$ 26,744.99
*297 This adjustment resulted in an increase in taxable income for 1943 from $4,278.57, as reported, to $31,023.56. The Commissioner's computation of selling price for 1944 is not in evidence. It appears. however, that a similar mark-up of cost to determine selling price was made by the Commissioner in 1944 resulting in an increase of selling price and income of the business for 1944 in the amount of $14,934.63, $7,467.32 thereof being included in the taxable income of each petitioner. During 1943 and 1944 the number of persons employed by the petitioner, or petitioner and his wife, in the operation of the restaurant varied from 12 to 14, but generally they had 12 employees. These employees were allowed two meals a day. The cost of the food consumed by the employees was about $1.50 a day for each employee, or approximately $6,000 a year on a basis of $10 a week for 12 employees over a period of 50 weeks. Petitioner's wife ate at the restaurant and petitioner ate there occasionally. It was the custom in the conduct of the business to give free drinks to certain customers and also to give bottles of liquor as gifts to certain customers, particularly during the Christmas holidays. *298 The cost of the liquor in bottles given to customers as gifts was about $900 a year. The petitioners contend that the determination of selling price or gross receipts by the Commissioner by a 100 per cent mark-up of the cost of food and a 200 per cent mark-up of the cost of liquor was arbitrary since he entirely disregarded the fact that employees ate two meals a day at the restaurant, and the common practice of courtesy drinks and gifts of liquor, thus including in selling price or gross receipts at least $12,000 for food and $2,700 for liquor for which there were no cash receipts whatever. The respondent seeks to justify the mark-up of costs to determine selling price on the ground that loans in excess of reported taxable income were paid by petitioners indicating that sales were understated and that prices charged for meals and drinks were high. Loans in the aggregate amount of $5,172 were paid in 1943. There is no evidence that any loans were paid in 1944. The reported taxable income of petitioner for 1943 was $4,278.57 and the aggregate of the reported taxable income of petitioner and his wife in 1944 was $7,152.46. The fact that loans are paid in excess of taxable income *299 by itself does not establish that sales are understated. Some deductions allowable in computing taxable income, such as depreciation and amortization of leasehold improvements, do not represent cash expenditures and the amounts of such deductions are available to the taxpayer for payment of loans or other items. Furthermore, although petitioner's wife testified that she and her husband lived on their income, there is no evidence that all of the income was required for their living expenses. The record leaves much to be desired and is very unsatisfactory. This may be due in part to the destruction of petitioners' records by fire, it appearing from a statement of respondent's counsel at the hearing that the Dog Club was destroyed by fire a few weeks prior to the hearing. However, no evidence to that effect was adduced by petitioners. The petitioners did not attempt to show the correct amount of sales or gross receipts of the restaurant business other than to suggest a stipulation to counsel for respondent at the hearing that the gross receipts reported in the 1943 and 1944 returns were the totals of the cash register tapes, which counsel for respondent refused to do for lack of knowledge. *300 The report of the revenue agent discloses cash register tapes were presented at the time of the investigation of the 1943 return but that it was impossible for the examiners to accept them due to conflicting statements made by the taxpayer's wife, his accountant and bartender. The revenue agent who made the examination for 1942, 1943 and 1944 testified that there were large envelopes which contained all the tapes, receipted bills for the particular day and guest checks. The petitioner's wife testified that a Dixie chicken dinner, which sold for $1.25, cost around 80 cents. This shows a profit on that dinner of 45 cents or 36 per cent. She testified further that the cost of a complete chicken dinner, which sold for $1.75, cost from $1 to $1.10. Taking the latter cost, the profit was 65 cents or about 37 per cent. The menu used, beginning in April, 1943, contained complete dinners ranging in price from $1.50 to $3.50 for a live whole broiled lobster dinner. The price of a sirloin steak dinner was $3 and of a special steak dinner $5. The special steak dinner was the same as the regular steak dinner except that it included a double steak. There was also a la carte service. The petitioner's *301 wife testified also that the profits of the business varied from 25 to 33 1/3 per cent, but that the latter was a very high per cent and she would have considered herself fortunate in the last couple of years to have made such a profit. In the 1943 return the total receipts reported were $92,600.64 which the Commissioner increased to $119,345.63. The reported amount of net cost of goods sold was $81,266.58 and other business deductions reported totalled $7,055.49. Using the total receipts as determined by the Commissioner the net profit is $31,023.56, or 25.994 per cent. In the 1944 returns the aggregate total receipts reported were $105,070.22, which were increased by the Commissioner by $14,934.63, to $120,004.85. The aggregate amount of net cost of goods sold reported was $68,301.63 and the aggregate of other business deductions reported was $29,616.13. Using the total receipts as determined by the Commissioner, the net profit is $22,087.09, or 18.405 per cent. Although it appears that some food and liquor were consumed and disposed of, but not sold, and there were no receipts therefor, it has not been shown that the total receipts or net profits as determined by the Commissioner *302 were excessive or arbitrary. The net profit resulting from the determination of the Commissioner in 1943 was 25.994 per cent and in 1944, 18.405 per cent. This is not an unreasonable or excessive profit in view of the testimony of petitioner's wife that the profit varied from 25 to 33 1/3 per cent. There is no evidence showing that the Commissioner was unreasonable or arbitrary in rejecting the cash register tapes. The evidence does not show that the petitioners could not have realized, at the prices charged for food, liquor and other items, the total receipts or profits as determined by the Commissioner or that his determination that sales were understated was without rational foundation or that the amount of sales determined by him was excessive. Cf. . The evidence is to the contrary. Under the circumstances, the determination of the Commissioner of the deficiencies in income tax of petitioner for 1943 and 1944 and of the deficiency in income tax of petitioner's wife for 1944 must be approved. Decision in Docket No. 18752 will be entered under Rule 50. Decision in Docket No. 18753 will be entered for the respondent.